## GEORGE SPARHAWK & wife *vs.* OTIS BULLARD.

In a writ of entry to recover flats, where both parties claim under a common ancestor or predecessor, the demandant cannot prevail unless he shows that the flats demanded were assigned to the party under whom he claims, in the division of the ancestor's estate, or that a title has been acquired by disseizin. A mere possessory title, which would be good against a stranger, is not sufficient ; for such a title may be acquired by a tortious entry.

A possessory title will not avail against the true owner of land, however long continued, unless the claimant has had such an open and exclusive possession as amounts to a disseizin.

For the purpose of establishing the location of demanded premises, grants of adjacent lands, between strangers, are admissible and relevant evidence.

When the proprietors of adjoining lots of land agree upon a dividing line between them, the presumption is, that it is the true line according to the original location of the lots.

An ancient location of flats adjacent to the flats demanded, by description in a deed between third persons, though unaccompanied by any open and notorious possession, will govern the line of the demanded premises, unless the party objecting can prove that the line ought to have been laid out in a different direction.

If a demandant shows that he, or those under whom he claims, had an actual seizin and possession prior to the tenant's entry, he is entitled to recover, although he may have no other title to the land than such possession, unless the tenant shows a better title in himself, or in those under whom he claims.

In the case of a grant of land with the flats belonging thereto, the tenant may show what flats belonged to the land, or that the demanded premises were not included in that grant.

The rule laid down in the case of *Rust* v. *Boston Mill Corporation*, 6 Pick. 158. for the division of flats in a cove, among conterminous proprietors, recognized and confirmed.

A creek in which the sea ebbs and flows, and from which the tide does not ebb entirely, is a boundary beyond which the owner of flats cannot recover.

Under the colonial ordinance of 1641, the ebb of the tide, when from natural causes it ebbs the lowest, and not the average or common ebb, is to be taken as the low-water mark.

THIS was a writ of entry *sur disseizin*, brought to recover a parcel of land, formerly flats, but now reclaimed from the sea, situated in a cove at the southerly part of Boston, near the junction of Washington and Pleasant Streets. The demandants claimed the premises as appurtenant to an upland lot bounded on Washington Street, and made title through sundry descents, devises, and mesne conveyances, from Elder William Colbron, who died in 1662, leaving numerous issue to whom he devised his estate, after the decease of his widow No general division of said

Colbron's estate was produced, but several partitions of portions of it among the different branches of his family, but not embracing distinctly the demanded premises, were exhibited ; and it was satisfactorily proved by circumstances, that a general division was made about the year 1673, of which no record can be found. The demandants claimed under Thomas Powell and his wife, who was a granddaughter of Colbron ; and the tenant claimed the premises as appurtenant to one or the other of two upland lots on Pleasant Street, which were shown to have been the property of Colbron, and afterwards of Mary Small and Sarah Colpit, who were also granddaughters of Colbron, and from whom the tenant made title. The demandants claimed so much of the flats owned by Colbron as would be comprehended between the side lines of the upland lot first mentioned, protracted in the same direction to low-water mark, and to run parallel with Castle Street, and of equal width from high-water to low-water mark. They relied on the ordinance of 1641, which provides that " in all creeks, coves, and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoin ing shall have propriety to the low-water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it *ebbs further ; provided that such proprietor shall not by this liberty* have power to stop or hinder the passage of boats or other vessels in or through any sea, creeks, or coves to other men's houses or lands." Ancient Charters, 148.

The demandants also relied on a supposed location by their predecessors, from which they derived an adverse possession of the demanded premises. To establish such a location, they offered in evidence office copies of a grant from the town of Boston to Samuel Phillips and others, in 1708, and an indenture of division between said grantees in 1709, containing the original laying out of Castle Street, which the demandants contended was the south boundary of Colbron's lands. The tenant objected to the admission of these deeds, as *res inter alios actæ*, but they were admitted in evidence. The demandants denied that the tenant had shown any title to the premises, and alleged that the flats, appurtenant to the upland lots of Mary Small and Sarah

Colpit, lay in a different place and direction. The side lines of said lots, protracted in the same direction, would cross the lines claimed by the demandants.

The tenant, who was in possession of the premises, on which he had built a house, resisted the claim of the demandants, and denied that the flats appurtenant to Colbron's upland had ever been distributed among his devisees by metes and bounds, or that there was any location of the flats by the demandants' predecessors, or that there had been any adverse possession by them, as against the other tenants in common or their assigns. He alleged that all the flats which belonged to Elder Colbron were now to be divided and distributed *de novo* ; and that, upon such a di vision, the demanded premises would fall to the shares of Mary Small and Sarah Colpit, or one of them, and would not fall to the share of Powell and wife ; in which last case, the tenant's title by possession would be sufficient for his protection.

The tenant also alleged the existence of an ancient natural creek, in which the tide ebbed and flowed, and which separated the demanded premises from the upland lot of the demandants. This was denied by the demandants, and the facts respecting the existence and dimensions of the creek were submitted to the jury by *Morton*, J., who tried the cause, under the same instructions that had been given by *Shaw*, C. J., in a former trial of the same question, namely, that " if they should find there was naturally and originally any creek in which the tide ebbed and flowed, and from which it did not ebb entirely at the time when, from natural causes, it ebbed the lowest, this would constitute a boundary of the flats, beyond which the demandants were not by law entitled to recover." The verdict negatived the existence of such a creek, and the tenant excepted to the instructions, and contended that the average or ordinary ebb of the tide ought to be taken as the line of the creek, and not the lowest ebb of the spring tide, which was the effect of the instructions. All questions of law and fact arising out of the deeds and other assurances on both sides, which were very numerous, * going

---

* The number of deeds and other documents, read and commented on by both parties, was more than one hundred. Among them was the following ex

back nearly to the time of the first settlement of Boston, were,
by agreement, submitted to the consideration and judgment of
the court. The arguments of the counsel for each party were
very elaborate, but were principally on the construction of the
documents, and the comparison of boundaries and titles.

On the point that the flats ought to be divided proportionally
among the proprietors of the upland lots, and as to the mode of
division, the tenant's counsel cited the case of *Rust* v. *Boston
Mill Corporation,* 6 Pick. 158.

On the point respecting the instructions relative to the creek,
they cited the colonial ordinance of 1641, and Hall's Rights in
Sea-Shores, 3, 16, 17. *Lord Fitzwalter's case,* 1 Mod. 105.
*Rogers* v. *Jones,* 1 Wend. 237, 256, 258. *Miles* v. *Rose,*
5 Taunt. 705. *Ward* v. *Creswell,* Willes, 265. *Commonwealth*
v. *Chapin,* 5 Pick. 199. *Gould* v. *James,* 6 Cow. 369. *Rex*
v. *Ward,* 4 Adolph. & Ellis, 384.

The counsel for the demandants, as to the latter point, cited
*Storer* v. *Freeman,* 6 Mass. 435. *Commonwealth* v. *Charles-
town,* 1 Pick. 180 ; and as to the admissibility in evidence of the
grant to Phillips and others, and the indenture of division made
by them, 1 Stark. Ev. 52, 53.

*Choate* and *Bartlett,* for the demandants.

*S. Hubbard* and *C. P. Curtis,* for the tenant.

WILDE, J. The land demanded in the present action is a
parcel of flats, situate in or near a small cove towards the south-
erly part of this city, on the westerly side of Washington Street,
which, previously to the year 1662, belonged to the estate of

---

tract from the town records, which Mr. Curtis, one of the tenant's counsel, sup-
posed was the origin of the reservation of Boston Common. It has been sup-
posed by some that the original reservation was by Blackstone, the first proprietor
of the peninsula, now the city of Boston.

" At a meeting of Elder Elliot, Elder Penn, Mr. Thomas Clarke, Thomas
Marshall, Jeremy Houchin, and Anthony Stoddard, 30th 1st mo. 1640.

" Also agreed upon y$^t$ henceforth there shall be no land granted eyther for
house-plott or garden, to any person, out of the open ground or comon field
wch is left between y$^e$ centry hill & Mr. Colbron's end, except 3 or 4 lotts to
make up y$_e$ streete from Br. Rob't Walker's to the Round Marsh."

The street here mentioned is Boylston Street, formerly Frog Lane. Centry
Hill was afterwards known as Beacon Hill, which formerly stood in rear, or
north of the State House.

one William Colbron. By his last will and testament, which was proved and allowed in 1662, he devised one fourth of his estate to his daughter Sarah Peirce, and her daughter Sarah Colpit; three eighths to his daughter Mary Turell and her five children by John Barrell; and three eighths to his daughter Elizabeth Paine, and her children by Moses Paine. No deed of partition or division of the lands devised, between the devisees, has been discovered. But it is admitted that such a division was made, as the devisees conveyed different portions of the land in severalty; and it must be presumed, nothing appearing to the contrary, that these conveyances were made conformably to their respective rights and titles derived to them from the partition.

The demandants derive their title from one of the heirs of the said Elizabeth Paine. By a deed of partition, made in 1697, the shares of her children and heirs were divided, and set off to them, in severalty. The first lot was set off to William Paine; the next lot northerly of William Paine's lot was set off to Thomas Powell and his wife Margaret; and the next lot northerly was set off to Thomas Walker and his wife. The demandants' title is derived, by sundry conveyances, from Thomas Powell and wife; and the general question to be decided is, whether their lot was so located as to include all or any part of the flats demanded. There is no question as to the upland included in this lot by the deed of partition; and the demandants claim all the flats below, from high-water to low-water marks, and of an equal width throughout.

This claim, it is contended, is sustained by the opinion of the court in the case of *Mary S. Jackson* v. *The Boston and Worcester Rail-Road Corporation*, which depended on the same title. But that opinion was founded on a misapprehension of some of the facts which have been satisfactorily proved in the present case. One of the deeds, under which the tenants claimed in that case, was not produced; and the opinion of the court was predicated on the supposition that the tenants had not traced back their title to Colbron's heirs. But this supposed defect in the evidence was supplied, and the tenant's title under those heirs was made

to appear, on an application by the tenants' counsel to stay the judgment, which was stayed accordingly. The same title has been proved in the present case. Both parties have deduced their titles from the heirs of Colbron ; and the demandants are not entitled to recover, unless they have shown that the flats demanded were assigned to the party under whom they claim, in the division of the Colbron estate among his heirs, or that they, and those from whom they claim, have acquired a title by disseizin. It is not sufficient to prove a mere possessory title which would be good against a stranger ; for such a title may be acquired by a tortious entry. If a party should enter upon a lot of land, under a deed to him from a person not seized, and having no title to the land, he might nevertheless by his entry acquire a lawful possession as against a stranger having no title. And if a stranger should enter and dispossess him, he might maintain a writ of entry against him to recover possession. But such a possessory title would not avail him against the true owner, however long it might have been continued, unless he had such an open and exclusive possession as would amount to a disseizin. It is necessary, therefore, for the demandants to show, that by the division of the Colbron estate among his heirs, and by the subsequent division by the heirs of Paine, the flats demanded were included within the lot assigned to Thomas Powell and wife, from whom they derive their title ; or that they have acquired a title by disseizin.

In order to ascertain the southerly line of the Colbron estate, and to prove that the flats demanded were included within the demandants' lot, in the division between the heirs of Colbron, and the subdivision between the heirs of Paine and his wife, a deed of an adjoining tract of land from the town of Boston to Phillips and others was offered in evidence, to the admission of which the tenant's counsel objected. But we are of opinion, that this evidence is competent and relevant. When the dividing line between two lots is the subject of controversy, the descriptions of both lots are to be considered. And if land be conveyed, as it was in this case, bounded by the line of a prior grant, evidence to prove that the respective owners agreed upon

the dividing line, is competent, and would be conclusive, if not opposed by other evidence, as to the original location of the lots. The land conveyed to Phillips and others, was, soon after the grant, divided between the proprietors in severalty ; and by the deed of partition, it appears that a new highway, called Castle Street, was laid out across the neck of land on the northerly side of their lot, and that the lot next adjoining on the south was set off to Stephen Minot, and was laid ought on a straight line, bounded by said way from low-water mark easterly to low-water mark westerly, across the neck. And it is recited in that deed, that the land thereby divided was bounded northerly by Daniel Epes on the westerly side of Orange Street. Recitals in ancient deeds are always competent evidence, and are presumed to be true, unless the contrary can be made to appear. This evidence is satisfactory to show that Daniel Epes's lot was bounded southerly by Castle Street. That lot, in the division among the heirs of Paine and wife, was assigned to William Paine, who afterwards conveyed it to the said Epes. This lot was laid out on the southerly side of the Colbron estate. The north line of Castle Street, therefore, must be considered as the south line of that estate. This is unquestionably true as to the upland ; for this lot, and the lot assigned to Minot, have been occupied up to Castle Street, ever since ; and these lines have never been disputed. A line thus established, and acquiesced in for such a length of time, must be considered as the true and original line of division between the two lots, unless the contrary can be proved by strong and incontrovertible evidence. We think no such evidence has been adduced in the present case.

It has been argued, that as the lot assigned to William Paine, as now occupied, bounded southerly by Castle Street, is a few feet wider on Washington Street, and a few feet narrower at high-water mark, than it was according to the measure given in the partition deed between the heirs of Paine and wife, it is to be presumed that the north line of Castle Street was a conventional line, established by the owners of the two lots adjoining the street, and was not the original line of the Colbron estate But we think there is no sufficient ground for such a presump-

9 *

tion.   When the proprietors of two adjoining lots agree upon a dividing line between them, the presumption is that it is the true line according to the original location of the lots.   And there is nothing in the present case to rebut such a presumption.   It is not improbable that when the partition was made between the heirs of Paine and wife, the southerly line of the Colbron estate was not ascertained with perfect accuracy, and that after the grant to Phillips and others, the true line was ascertained and established.   We therefore conclude that the northerly line of Castle Street is to be taken as the southerly line of the Colbron lot, and that it is to be continued in the same direction to low-water mark.   The lot of Stephen Minot was laid out in that di rection over the flats ; and such an ancient location is entitled to great consideration, and is not to be disturbed, unless it can be proved that it ought to have been laid out in a different direction. No such evidence has been produced, and there is no reason to doubt that the location was made in conformity to the respective rights of the parties.   The lots southerly of Minot's lot are, as we understand, located in a similar manner, by lines parallel with Castle Street, so that the evidence is quite satisfactory to prove that these locations were rightly made, and that the lines dividing the flats were extended in a proper direction.

The south line of the Colbron estate being thus ascertained, the demandants contend that in the division of that estate, Moses Paine and wife, or their heirs, took all the flats in front of the upland, assigned to them in severalty, bounded northerly by a line parallel with Castle Street.   But this claim is not sustained by the evidence.   The only inference to be drawn from the conveyances by the heirs of Colbron is, that the flats were not divided by any particular location.   No lines dividing the flats are designated.   The upland only was divided ; the flats being left to be distributed according to law, each party being entitled to his due proportion of them as his purparty, or as incident to the part of the upland assigned to him in severalty by the deed of partition.   The flats belonging to the demandants' lot are not located.   The south line of William Paine's flats is designated and established by the evidence ; but the north line of his flats

and the other lines of the flats belonging to the other heirs of Moses Paine and wife, are indefinite. The parties holding under titles derived from the other heirs of Colbron have as good a right to the flats in front of their-lots, as the demandants have to theirs. But as these claims interfere, the conclusion is that the flats must be divided so as to give to each party his just propor tion.

But it is objected by the demandants' counsel, that by a di-vision of the flats according to law, no part of the flats demanded can be included within the tenant's lot, and therefore he cannot set up a title in a third party under whom he does not claim, to defeat the demandants' title. This objection would be well founded, if the demandants had shown that they, or those from whom they derive title, had an actual seizin and possession, prior to the tenant's entry. For if A. enters on the land of B. and disseizes him, and afterwards C., without right, enters on A. and ousts him, A. may maintain a writ of entry *sur disseizin* against C., and C. cannot set up the title of B. in defence, unless he claims under him or was in by his permission. But the evidence in the case does not allow the demandants to avail themselves of this principle of law. They have had no actual possession of the flats. The possession proved is constructive, and is limited to their right. They have acquired no title by disseizin. And it is competent for the tenant, in all cases, to prove that the de mandant was never seized, either of the whole or a part of the demanded premises. For if it appears that the demandant was never seized, he is not entitled to maintain his action. Now when Powell and wife entered, under the deed of partition, upon the upland assigned to them, they became seized of all the flats belonging to that lot, and of no more. The tenant there-fore has a right to show what portion of the flats demanded, if any, belonged to their lot. To determine this, it is necessary to ascertain the true line dividing the flats at the northern ex-tremity of the cove. And this line we have found it exceeding-ly difficult to ascertain with entire satisfaction. The demand-ants have attempted to ascertain it, by establishing the south line of " the common " belonging to the town ; and for this

purpose they gave in evidence the copy of a vote of the town in 1794, granting sundry lots to certain proprietors of rope-walks, reserving, however, a strip of land, sixty feet in width, on the southerly side of the common, for a road from Pleasant Street to the channel. Grants to the said proprietors were made accordingly. This street was to be run parallel with Beacon Street. But the lines of Beacon Street, as they existed in 1794, have not been ascertained, by reason of alterations since made, and the loss of the plan and survey of the lots granted by the town. The parties therefore rely respectively on the northerly and southerly lines of occupation of the lots adjoining the new street, as evidence of their original location. But these lines do not coincide ; and which, if either of them, corresponds with the original location, is left wholly uncertain. Neither of them corresponds with the lines dividing the flats southerly, as they are now occupied. Amid these conflicting lines, there being no monuments to refer to, it is impossible to ascertain the location of this street.

We are in the next place to consider the evidence, offered by the demandants, for the purpose of ascertaining a line further southerly. The first deed relied on is one from George Tilley to Christopher Tilden, dated August 28th, 1744. The land conveyed is bounded easterly on Pleasant Street, and there measures 387 feet ; southerly on land of John Cornish, and there measures 145 feet, and so down to low-water mark ; westerly by the sea or salt water, and there measures 410 feet ; northerly on the land of the said George Tilley, and there measures 96 feet, down to the fence ; and from thence on the same line down to low-water mark. By this description, it appears that the northerly and southerly lines of the lot are not parallel, the lot being 23 feet wider at the sea than it is at the street ; and the question is, which line, if either, is to be considered as the line in conformity to which the line at the northern extremity of the cove is to be extended.

It was argued for the tenant, that the southerly line, if either, is to be presumed to be the true line. But this line, as appears by the plan, is within the cove, and cannot be the true line of

division between the Colbron heirs, unless there was a location of the flats by that division ; and that there was no such location must be inferred, as before remarked, from all the conveyances of hose heirs.   But the northern line of the Tilley lot is very nearly, if not exactly, at the northern extremity of the cove.   To this line it is objected, that Tilley owned the land on both sides of the line, and so might carve out and convey any part of his estate by such lines as he saw fit.   The answer to this objection is, that the northerly line of the lot conveyed by Tilley to Tilden is in fact the northerly line of the Dinely lot ; and this we think satisfactorily appears from the evidence.

The lot mortgaged to Tilden, and afterwards conveyed to Jonas Clark, was purchased by Tilley from the executors of Elisha Cook, who derived his title from Dinely ; and was bounded southerly by land of John Cornish, and northerly by the land of David Colson.   It is true there is a small variance in the description of the lot in the deed from the executors of Cook to Tilley, and in that contained in the deed from Tilley to Tilden.   In the former deed, the line at the sea is said to measure six feet more than the same line is said to measure in the latter deed, and the line at the road seven feet less.   If this were the true measure between the lots of Cook and Colson, it is obvious that the dividing line would extend six feet further north at the sea than it does by the deed to Tilden, and the course of the line would vary from all the other lines.   The measure of lots, however, is not to be depended upon ; and it may be presumed that the measure of the lines at the street, and at the sea, in the deed from the executors of Cook to Tilley, was incorrect, and that the errors were corrected before the conveyance to Tilden.   By the deed to Tilden, the northerly line is described as " measuring ninety-six feet down to the fence, and from thence on the same line down to low-water mark."   And by the deed from Colson to Tilley, it appears that his lot was fenced in.   The fence, therefore, referred to in the deed from Tilley to Tilden, may be presumed to be on the dividing line between the lots purchased of the executors of Cook and Colson, and it is probable that by reference to that fence as a boun

dary, the measure of the lines at the street and at the sea was corrected. After the mortgage of this lot to Tilden, Tilley conveyed it to Jonas Clark, who conveyed it to his daughter, Mary Minot. It was again conveyed by Stephen Minot to Joseph Waldo, and by him conveyed to William Powell. All these are ancient conveyances, and in all of them the description of the lot is the same. We think, therefore, there is sufficient reason to presume that this is the true description of the lot, as it was held by Fathergone Dinely, from whom Elisha Cook derived his title.

Another argument in favor of adopting the north line of the Dinely lot, as described in the deeds from Tilley, is that it agrees, very nearly, with all the side lines of the lots northerly, up to the street at the bottom of " the common " ; and these lines are very nearly at right angles with the general course of the shore northerly of the cove. Now if these lines were not established with sufficient certainty, the correct method, by which these flats to the north of the cove should be divided, would be to draw a straight line according to the general course of the shore at high water, and from this line to extend the side lines of the several lots in a direction at right angles with the shore line. And by this method the flats might be divided with sufficient accuracy for all practical purposes.

These considerations seem to be sufficient to establish the north line of the Dinely lot, as the north line of the flats within the cove ; and this view of the question is confirmed by another consideration. .It appears, by the plans in the case, that the north line of the Dinely lot is at the northern extremity of the cove. The line of the shore there, at high-water mark, begins to incline further easterly ; all the flats, therefore, lying between this line, in whatever direction it ought to be extended, and the north line of Castle Street, are within the cove, subject to division according to the rule of law in such cases established. Hence it follows, that the present parties, and all the proprietors of the flats within the cove, have a common interest in extending the line northerly, as far as may be ; for if the line should be drawn parallel with the south line of the Dinely lot,

which is the north line of the tenant's lot, or with the line of occupation of the ropewalk lots, the quantity of flats to be divided within the cove would be less than it would be if the line were extended in the same direction of the north line of the Dinely lot. The tenant, therefore, cannot be injured by the adoption of the latter line as the true line of the cove. For if he or Ephraim Marsh, from whom he derived his title, has acquired a title, by disseizin, to the flats conveyed by Cornish, it would be indifferent to them in what direction the north line of the flats within the cove might be extended ; but the disseizin of any of the proprietors cannot affect the division. If Marsh has acquired any title by disseizin, that can only affect the proprietors of the Lowell lot; but cannot interfere with the demandants' lot.

No injustice, therefore, can be done to any party, by taking the north line of the Dinely lot, as designated in the conveyances from Tilley to Tilden and others, as the northerly line of the flats within the cove. And consequently all the flats situated between this line and the north line of Castle Street, extending to low-water mark, are to be divided among the conterminous proprietors, according to the rule laid down in the case of *Rust* v. *The Boston Mill Corporation*, 6 Pick. 158.

This division being made, the demandants will be entitled to recover the portion of flats belonging to their lot, and no more ; for, of the residue of the flats demanded, they have proved no seizin either in themselves, or in those from whom they have derived their title.

A question was made at the trial respecting the existence of a creek, which was alleged to have separated the land demanded from the upland and flats belonging to the demandants. This question was submitted to the jury, who were instructed that if they should find there was naturally and originally any such creek, in which the tide ebbed and flowed, and from which it did not ebb at the times when from natural causes it ebbed the lowest, this would constitute a boundary of the flats, beyond which the demandants would not by law be entitled to recover. The jury found a verdict negativing the existence of such a creek ; and the tenant's counsel excepted to these instructions.

The court are of opinion that the exception cannot be sus-
tained.   The object of the ordinance of 1641, from which the
right to flats originated, was to give the proprietors of land ad
joining on the sea convenient wharf-privileges, to enjoy which,
to the best advantage, it is often necessary to extend their
wharves to low-water mark at such times when the tides ebb the
lowest.   6 Mass. 438.   We think therefore that the instruction
to the jury on this point was correct.

A survey of the flats within the cove is to be taken, accord-
ing to the principles now established, in order to ascertain the
portion which the demandants are entitled to recover ; which
being done, judgment will be accordingly for the demandants.